UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
                          :

DLJ MORTGAGE CAPITAL, INC.,          :
                          :

          Plaintiff,           :       **MEMORANDUM**
                          :       **AND ORDER**
                          :

       - against -          :       08-CV-4607 (ENV) (RML)
                          :

THOMAS KONTOGIANNIS, GEORGIA     :
KONTOGIANNIS, LISA DIPINTO a/k/a LISA   :
KONTOGIANNIS a/k/a LISA PALLATOS, ANNETTE  :
APERGIS, CHLOE KONTOGIANNIS, ADAM DIPINTO, :
ELIAS APERGIS, JOHN T. MICHAEL, MICHAEL A.  :
GALLAN, ESQ., TED DOUMAZIOS, ESQ.,     :
THOMAS F. CUSACK, III, ESQ., STEPHEN P.   :
BROWN, ESQ., STEVEN A. MARTINI,      :
CARMINE CUOMO, COASTAL CAPITAL     :
CORPORATION, d/b/a THE MORTGAGE SHOP   :
d/b/a CLEARLIGHT MORTGAGE, EDGEWATER   :
DEVELOPMENT, INC., GROUP KAPPA CORP.,   :
LORING ESTATES LLC, PARKVIEW FINANCIAL  :
CENTER, INC., d/b/a PARKVIEW FINANCIAL, INC., :
CLEAR VIEW ABSTRACT LLC, TRIUMPH    :
ABSTRACT, INC., BOND & WALSH CONSTRUCTION :
COMPANY, INTERAMERICAN MORTGAGE CORP.,  :
and PLAZA REAL ESTATE HOLDING INC.,    :
                          :

          Defendants.        :
                          :
------------------------------------------------------------------------ X

**VITALIANO, D.J.**

     Plaintiff DLJ Mortgage Capital, Inc. ("DLJ") commenced this action in November 2008 by

filing a verified complaint against more than two dozen defendants, alleging violations of the

Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO") and

asserting various pendent claims. On March 10, 2009, plaintiff filed a corrected amended complaint

against 24 defendants asserting many of the same claims, but amplifying its supporting allegations.

The gravamen of the 107-page, 14-count pleading is that DLJ was defrauded of more than $50

million by a wide-ranging phony mortgage and money laundering scheme spearheaded by Thomas Kontogiannis and his nephew John T. Michael, and carried out by other defendants acting in various capacities.

Defendants now move to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted.

## Background[1]

The following allegations are drawn from the text of the amended complaint and its attached exhibits, and are considered true for purposes of the current motion.

## I.    The Alleged Mortgage Fraud Scam

DLJ is a financial institution which engages in, among other things, the purchase of residential mortgage loans. (Am. Compl. ¶ 3.) It alleges that over the course of several years, defendants worked in concert to fake real estate sales and mortgage loan transactions (the "fraudulent transactions"), and then sell those fake loans to DLJ and other financial institutions. DLJ claims to have been defrauded out of approximately $50 million which it paid defendants over the course of 95 transactions between 2004 and 2006. (Id. ¶¶ 105-08.)

The scheme is alleged to involve individuals and companies performing or contracting for virtually every type of traditional real estate or mortgage market service, including the sale of mortgages in the secondary market. Numbered among defendants are the record owners of subject properties, alleged straw buyers of those properties, the mortgage originator, abstract companies and

---

[1]    The Court has previously addressed motions for preliminary relief brought by DLJ to prevent defendants from dissipating real property at the heart of the alleged mortgage scheme. On January 22, 2009, this Court denied the bulk of plaintiff's motion for attachment, but enjoined the transfer of six properties during the pendency of the litigation. DLJ Mortgage Capital, Inc. v. Kontogiannis, 594 F. Supp. 2d 308 (Dkt. # 93.) On June 3, 2009, the Court denied DLJ's request for a temporary restraining order enjoining sale of certain properties owned by defendants Edgewater Development, Inc. and Loring Estates LLC. 2009 WL 1546383 (Dkt. # 168.) At the same time, Magistrate Judge Robert M. Levy vacated notices of pendency imposed by DLJ on 22 relevant properties. 2009 WL 1652253 (Dkt. # 173.) In addition, several of the defendants in this action are also facing federal criminal charges arising out the same alleged mortgage fraud scheme. The criminal case is currently pending in this District before Judge Kiyo A. Matsumoto. United States v. Kontogiannis et al., 09-CR-360.

their individual agents, closing attorneys, settlement agents, and real estate appraisers. DLJ claims that this criminal coalition – which it terms the "Kontogiannis Enterprise" (id. ¶ 4) – had a "pyramid-like management structure with Thomas Kontogiannis at the top . . . and from that vantage point he direct[ed] all of the enterprise's legitimate and illegitimate business activities." (Id. ¶ 86.) While the alleged enterprise was comprised of Thomas Kontogiannis's family members, friends, business associates, and companies under their control, its "upper management team" included: Kontogiannis' wife, Georgia; one of Kontogiannis' daughters, Annette Apergis, and her husband, Elias Apergis; and John Michael, "as well as others." (Id.) John Michael, in particular, is alleged to have "helped run the Kontogiannis Enterprise" (id. ¶ 37) and to have "orchestrated the creation" of the fraudulent loans, their sale to DLJ, and subsequent cover-up payments. (Id. ¶ 32.)

According to DLJ, the scheme was generally executed as follows. First, Thomas Kontogiannis and John Michael arranged for the creation of false credit reports, loan applications, and other required documentation for their chosen "straw buyer" in connection with purported purchases of residential property in Queens and Brooklyn, New York. (Id. ¶ 90.) Over the course of the 95 fraudulent transactions, many people functioned as straw buyers, including the following defendants: Georgia Kontogiannis (for two DLJ trasanctions); Elias Apergis (one); the Kontogiannis' daughter, Chloe Kontogiannis (two); the Kontogiannis' son-in-law, Adam DiPinto (four); and Carmine Cuomo (two).[2] (Id. ¶ 91 & Ex. 1.) The straw buyers were told that they were not responsible for monthly mortgage payments (id. ¶ 104) and were sometimes paid a fee for their efforts. (Id. ¶ 38.) The false loan applications were then submitted to Coastal Capital Corporation

---

[2]  These figures do not include sales of fraudulent loans allegedly perpetrated on financial institutions other than DLJ. Carmine Cuomo, for example, is also alleged to have acted as a straw buyer of several other properties unrelated to DLJ in 2003 and 2004. (Id. ¶ 73.) Details of each of the 95 fraudulent transactions affecting DLJ, including the relevant property, alleged straw buyer, and date of closing, among other information, were provided in spreadsheet form as an exhibit to the amended complaint, as discussed infra at Discussion Part II.A.

("Coastal Capital"), a mortgage finance company which Thomas Kontogiannis purchased in 2000, but vested 70% of the stock in the name of his daughter, Lisa DiPinto, and the remaining 30% in the name of John Michael.[3] (Id. ¶ 41.) By approving the loan applications, Coastal Capital acted as the corporate funding vehicle, drawing on its warehouse lenders to fund the fraudulent loans. (Id. ¶ 90.)

Next, Thomas Kontogiannis and/or his agents contacted a conspiring real estate appraiser, such as defendant Stephen Martini (for 15 of the DLJ transactions), to obtain a fraudulent appraisal for the property to be delivered to Coastal Capital. (Id. ¶¶ 72, 90.) This was followed by a sham closing attended by the straw buyer and appraiser. Also attending, via an authorized representative, was the corporate record owner of the property, which was always one of three companies owned and/or controlled by Thomas Kontogiannis: Edgewater Development, Inc. ("Edgewater"), Group Kappa Corporation ("Group Kappa"), or Loring Estates, LLC ("Loring Estates") (collectively, the "selling entities"). (Id. ¶¶ 45-47.) In almost all of the closings, the seller's agent at the closing was Elias Apergis (for 86 of the fraudulent transactions), Chloe Kontogiannis (four), or Cuomo (one). (Id. ¶ 91.) Also present was a closing attorney – either defendant Michael A. Gallan (for 79 of the fraudulent transactions) or Thomas F. Cusack (16) – who executed various false closing documents such as mortgages, notes, deeds, and uniform settlement statements (id. ¶ 91), "so that the purchaser of the fraudulent mortgage (DLJ) would not detect the fraud." (Id. ¶¶ 70-71.) The closing attorney also distributed the loan proceeds "in accordance with Thomas Kontogiannis's directives" (id.), with most of the money going to entities controlled by him or his family. (Id. ¶ 104.) Another actor at the sham closings was an abstract company, usually either defendant Clear View Abstract, LLC ("Clear View") (for 58 of the fraudulent transactions) or Triumph Abstract, Inc. ("Triumph") (16), and its representative title agent Ted Doumazios (for Clear View) or Stephen P. Brown (for

---

[3]  DLJ also alleges that defendant InterAmerican Mortgage Corporation ("InterAmerican"), a Kontogiannis entity that was folded into Coastal Capital following a 2005 fraudulent conduct conviction, regularly created fraudulent mortgages and loans, and sold them to financial institutions. (Id. ¶¶ 26, 44.)

Triumph). (Id. ¶ 91.) The title agent, who, according to DLJ, was obligated to ensure that "appropriate taxes are paid, title insurance is purchased, note is properly executed and mortgage is recorded," aided in the scheme by purposefully neglecting to record deeds and mortgages and pay the various taxes and fees. (Id. ¶¶ 78-83.) As DLJ sees it, all parties at the closing knew their defined roles in the scheme, and were accordingly compensated for their involvement. (Id. ¶ 92.)

After the "closing," defendants re-sold the unrecorded underlying mortgages in the secondary-mortgage market to a federally chartered bank or another financial institution such as DLJ. (Id. ¶ 93.) Central to the scheme was the fact that DLJ had a loan purchase agreement with Coastal Capital. Specifically, either Lisa DiPinto or John Michael instructed a Coastal Capital employee to provide DLJ with information about the fraudulent transaction, upon which DLJ quoted Coastal Capital a price for that loan. If Coastal Capital accepted, DLJ became "obligated to purchase the loan at the locked price, subject to DLJ's satisfactory inspection and review of the loan file." (Id. ¶ 106.) Coastal Capital then sent the loan file to DLJ's out-of-state fulfillment center, who alerted Coastal Capital if there were any missing or incomplete documents. In those circumstances, Coastal Capital "provided the requested documentation (which was fraudulent) . . . by e-mail or facsimile," such as insurance certificates, loan documents, and pay histories. (Id. ¶ 138 & Ex. 8.) If the center was satisfied after completing its loan file review, it informed DLJ, which wired funds to several of Coastal Capital's banks. (Id. ¶ 106) Pursuant to this procedure, Coastal Capital had sold over 1000 legitimate loans to DLJ between 2000 and 2004, so the procedure was well-entrenched at the time that DLJ acquired the 95 fraudulent transactions. (Id. ¶ 107.)

DLJ further contends that the mortgage scam continued in two important ways following the sale of a fraudulent transaction. First, the RICO defendants concealed their activities from DLJ and other purchasers by making monthly mortgage payments on the fake loans via interstate mail and wire, including to DLJ's service providers. To maintain the illusion that the loans were legitimate

and performing, and lull DLJ into a position where it would not scrutinize the transactions, payments were made by Group Kappa (on 56 occasions), Edgewater (16 occasions), and Parkview Financial, Inc. ("Parkview"), another company owned and/or controlled by Thomas Kontogiannis (1172 occasions). (Id. ¶ 93.) All of the Edgewater payments were made through checks signed by Elias Apergis, while eight of the checks from Parkview were signed by Annette Apergis. (Id. & Ex. 6.) Further, in seven instances, these payments were made "pursuant to management agreements executed by the straw buyers" which were mailed from Group Kappa to a straw buyer and back again, and then faxed to DLJ's loan servicer. (Id. ¶ 139 & Ex. 9.)

Second, several individuals involved in the fraudulent transactions "also had an active role in the second phase of the fraud – the resale of [54 of the subject] properties . . . to seemingly legitimate purchasers" between 2004 and 2008. (Id. ¶ 94.) At a subsequent closing, Elias Apergis (for nine of the re-sales), Cuomo (35), or others would appear on behalf of one of the three selling entities, execute the closing documents, and collect the proceeds, which would be dispersed as directed by Thomas Kontogiannis. (Id.) Since the fraudulent mortgages were never recorded, DLJ's position in the chain of title for each of the resold properties was compromised.

DLJ also alleges that, starting in 2008, Loring Estates sought to hide assets by fraudulently transferring six of the 95 properties involved in the fraudulent transactions to defendant Plaza Real Estate Holdings, Inc. ("Plaza"), a company formed by Annette and Elias Apergis. (Id. ¶ 84.)

## II.   The Cunningham Scandal

DLJ alleges that Thomas Kontogiannis is a "career white-collar criminal who has stolen tens of millions of dollars through extensive criminal behavior and invested that money in legitimate and illegitimate businesses." (Am. Compl. ¶ 15.) Throughout the complaint, DLJ delineates the criminal history of Kontogiannis and his business entities, including guilty pleas in 1993 for an immigration scheme (id. ¶ 16), and in 2002 for a bribery scheme involving the New York City

Board of Education. (Id. ¶¶ 17-19.) Most critical, however, is Kontogiannis's role in a bribery scandal involving former Congressman Randall "Duke" Cunningham. DLJ believes that if not for the investigations and prosecutions arising out of that scandal, the mortgage fraud scheme DLJ alleges in this action would have never been exposed and halted. (Id. ¶ 100.)

On March 16, 2008, Thomas Kontogiannis pled guilty in the Southern District of California to one count of engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, and was sentenced to 97 months in prison. (Id. ¶ 7.) DLJ claims that in his February 9, 2007 plea agreement, Kontogiannis described how four fraudulent mortgage loan transactions, all executed by Rodney Baussan, a maintenance man at one of his buildings (the "Baussan Loans"), "played a central role in the Cunningham scam." (Id. ¶ 9.) Three of these loans were sold to a federally chartered financial institution in 2003, while the fourth was sold to DLJ in 2004. (Id. ¶ 10.) As part of his plea, Kontogiannis allegedly admitted that he, John Michael, and others were involved in writing and selling fraudulent mortgages on various properties, and that they "regularly engaged in financial transactions involving the proceeds of unlawful activities, mostly mortgage/bank fraud."[4] (Id. ¶ 12.) In the amended complaint, DLJ excerpts a portion of Thomas Kontogiannis's plea, as well as other testimony and motions from the Cunningham investigation, which describe the following activity:

Cunningham sought to purchase real estate. Kontogiannis, believing that Cunningham would receive money from unlawful activity (such as bribes), arranged with John Michael to finance the purchase with two mortgages from Coastal Capital, which obtained funds from its warehouse lenders on a short term basis. When Cunningham failed to come up with the money as

---

[4]  Also arising out of the scandal, on February 4, 2008, John Michael pled guilty to one count of conspiracy to engage in unlawful monetary transactions and one count of making a false statement to a grand jury. (Id. ¶ 31.) In his allocution, he admitted to "suspect[ing]" that "at least some of the mortgage transactions [Thomas Kontogiannis] put together after using Coastal Capital as a lender may be fraudulent" but he "allowed many loans to be processe[d] without asking any questions." (Id. ¶ 42.)

quickly as anticipated, Kontogiannis and Michael decided to pay back the lenders (and divert money to themselves) by steering to Coastal Capital proceeds from a separate fraudulent mortgage of $565,000 – a Baussan Loan – that was originally intended to go to other entities controlled by Kontogiannis. (Id.) On May 13, 2004, Cunningham's associate wired $525,000 into the operating account of Parkview, $500,000 of which was then transferred into a joint checking account of Annette and Elias Apergis. That same $500,000 was then wired to defendant Bond & Walsh Construction Company ("Bond & Walsh"), an entity controlled by Thomas Kontogiannis and run by Annette and Elias Apergis. (Id. ¶¶ 14, 126-29.)

## Discussion

The complaint, as amended, asserts 14 claims against various defendants. DLJ's two federal claims are leveled against all defendants for their alleged participation in RICO-outlawed activity, 18 U.S.C. § 1962(c), and for conspiracy to violate RICO, 18 U.S.C. § 1962(d). Four pendent common law causes of action are also asserted against all defendants: (1) fraud, for having misrepresented and/or failing to advise DLJ of the true status of the allegedly fraudulent mortgages; (2) civil conspiracy to defraud DLJ; (3) conversion, by their "exercise of dominion and control over DLJ's monies" (id. ¶ 164); and (4) unjust enrichment. In addition, the complaint alleges two fraudulent conveyance claims, under New York Debtor & Creditor Law § 270 et seq., against Coastal Capital, for transferring money received from DLJ to other defendants, and Plaza Real Estate, for receiving properties from Group Kappa and Loring Estates to defraud creditors. DLJ also seeks to impose constructive trusts over certain mortgages and properties held by defendants. Finally, DLJ asserts contract claims against Coastal Capital, for breach of representations and warranties in its loan purchase agreement with DLJ with respect to the sale of mortgages, and against four straw buyers for default of payment of their promissory notes: (1) Adam DiPinto (four notes); (2) Cuomo (two notes); (3) Georgia Kontogiannis (two notes); and (4) Elias Apergis (one

8

note). According to DLJ, defendants agreed in these notes to pay back Coastal Capital "or its assignees (which includes DLJ pursuant to the Loan Purchase Agreement [with Coastal])." (Id. ¶ 253.)

Defendants now move to dismiss the amended complaint.[5] Their principal efforts are focused on dispatching the federal claims, arguing that DLJ has failed to demonstrate elements necessary to support the RICO actions as distinguished from more traditional state law claims. Defendants, moreover, contend – and DLJ agrees – that if the Court dismisses the RICO claims, it should not exercise supplemental jurisdiction over the remaining state law causes of action. Finally, and in the alternative, defendants argue that the state law claims, if entertained, should, in any case, be dismissed pursuant to Rule 12(b)(6).

## I.    **Standard of Review**

Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." This rule does not compel a litigant to supply "detailed factual allegations" in support of his claims, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007), "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers 'labels and conclusions' . . . will not do." Id. (quoting Twombly, 550 U.S. at 555); see also In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007). "Nor does a complaint

---

[5]    Defendants Gallan, Michael, Brown, and Kontogiannis family members (including corporate entities in which they have an interest) filed separate moving and/or reply briefs on the current motion to dismiss, and often replicated each other's arguments. The Court refers to the defendants' briefs and arguments collectively unless otherwise specified. Six defendants, however, have failed to respond to the original or amended complaint, or otherwise appear in this action. The Clerk of the Court has entered notations of default against Doumazios (Dkt. #125), Clear View (#128), Martini (#130), Cuomo (#131), Triumph (#132), and Coastal Capital (no docket number; May 29, 2009). Nonetheless, claims dismissed for want of jurisdiction or for failure to state a claim will be dismissed without prejudice as to these defendants as well.

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557).

To survive a Rule 12(b) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotations omitted); see Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (interpreting Twombly to require a "plausibility standard" that "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible") (emphasis omitted), rev'd on other grounds, 129 S. Ct. 1937 (2009). On a Rule 12(b)(6) motion, the Court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008). The court may only consider the pleading itself, documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit, and matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Int'l Audiotext Network, Inc. v. Am. Tel.& Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).

## II.    DLJ's Pleading "Technique"

As an initial matter, the Court addresses defendants' contention that many of plaintiff's allegations are fatally flawed because the amended complaint is grounded on two "dubious pleading technique[s]." (Defs.' Br. (Dkt. # 141) at 18.)

### A.    Summary Charts As Exhibits

First, defendants attack DLJ's attempt to rely on over 100 pages of spreadsheets attached to the complaint as exhibits which summarize details of the mortgages and individual defendants'

10

criminal activity. For example, Exhibit 1 purports to identify information about each of the 95 fraudulent transactions, including the DLJ loan number, a property at issue's street address, the seller company and its agent, the purchaser, the purchase price, the date of closing, the appraiser, and the abstract company. Exhibits 8 and 9 respectively list each occasion on which Coastal Capital provided additional documentation to DLJ's fulfillment center or mailed management agreements. Defendants make particular objection to Exhibit 6, a 63-page chart detailing all of the checks and wire payments "caused" by the "Kontogiannis Enterprise" to be made to DLJ's loan servicers as cover-up payments, including payments by Parkview, Edgewater and Group Kappa, and checks signed by Annette and Elias Apergis. The exhibit provides information that includes the loan numbers, the address of the property at issue, the check number and signature, the account number, and the payment amount. The pertinent information reflected on these summary charts is also generally discussed in the body of the complaint. (Am. Compl. ¶¶ 108, 131-35, 138-39.)

The first stage of attack is, really, not about substance. Defendants argue more broadly that the charts are improper because they do not constitute "written instruments" that may be attached to pleadings pursuant to Federal Rule of Civil Procedure 10(c).[6] Defendants rely on United States v. Int'l Longshoremen's Ass'n, in which the court explained that "[a] 'written instrument' is a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement." 518 F. Supp. 2d 422, 465 (E.D.N.Y. 2007) (quoting Murphy v. Cadillac Rubber & Plastics, Inc., 946 F. Supp. 1108, 1115 (W.D.N.Y. 1996)). Yet, it is clear from the context of that decision (also a RICO case) that the court did not intend to state a hard and fast rule that the only acceptable "exhibits" are those with independent legal effect. Rather, the proposed exhibits in that case – lengthy pleadings in prior

---

[6]   Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."

legal actions involving the defendants – were improper because they contained "entire legal theories that appear[ed] nowhere on the face of the Amended Complaint," and plaintiffs "attempt[ed] to plead many essential elements of the alleged RICO claims by 'incorporating' hundreds of pages of prior pleadings, with no guidance as to which specific allegations [we]re intended to be deemed incorporated," running afoul of the notice requirements of Rule 8(a). Id. at 461, 466.

Defendants also cite DeMarco v. Depotech Corp., in which the court invoked Rule 10(c) to strike an expert affidavit attached as an exhibit because it constituted speculative "evidentiary matter" such as the expert's own assessments. 149 F. Supp. 2d 1212, 1220 (S.D. Cal. 2001), aff'd, 32 Fed. Appx. 260 (9th Cir. 2002). However, the court acknowledged that the plaintiffs "replicated almost all of the relevant portions" of that affidavit in the body of the complaint itself, and refused to strike those paragraphs even though they were "derived" from the expert. Id. at 1222. But, again, no inflexible rule was articulated.

More to the point, DLJ's exhibits here present none of the concerns actually identified by the courts in the decisions relied upon by defendants. The amended complaint explicitly references the conduct summarized in the spreadsheets, and the exhibits do not pose any new allegations or legal theories separate from the content of the numbered paragraphs of the amended complaint. Rather, the exhibits simply catalog the specific factual details with respect to each relevant transaction in an accessible and user-friendly format. Defendants have ample notice of DLJ's allegations, and forcing DLJ to add a paragraph into the body of the complaint for every separate transaction would serve no practical purpose. It is not surprising, then, that courts have routinely considered these sorts of charts proper, whether incorporated directly into a RICO complaint or appended as "exhibits." See, e.g., Moore v. Painewebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999) (finding predicate acts sufficiently pled under Rule 9(b) where complaint contained a "chart listing twelve different mailings said to contain fraudulent representations, along with the dates of these

mailings and cross-references to the paragraphs of the complaint in which the mailings are further discussed"); State Farm Mut. Auto. Ins. Co. v. Grafman, 04-CV-2609, 2007 U.S. Dist. LEXIS 96751, at *31 (E.D.N.Y. May 22, 2007) (finding "ample specificity regarding the RICO claims" where plaintiff "provided charts, attached as [e]xhibits . . . which detail a sample of the bills comprising the racketeering activity, mail fraud"); AIU Ins. Co. v. Olmecs Med. Supply, Inc., 04-CV-2934, 2005 U.S. Dist. LEXIS 29666, at *39 (E.D.N.Y. Feb. 22, 2005) (finding "sufficient detail to satisfy the particularity requirements of Rule 9(b)" where plaintiffs included a "detailed chart of 480 separate RICO events, including the [defendant] who submitted the [fraudulent insurance] claim, the claim number, the [s]upplies billed for, the prices charged, the dates of the submissions, and the wholesale defendant who purportedly provided the [s]upplies").

B.     Excerpts From Other Proceedings

On another tack, defendants question DLJ's reliance on allegations drawn from documents filed during the course of criminal prosecutions of Thomas Kontogiannis and John Michael vis-à-vis the Cunningham scandal.  Indeed, throughout the amended complaint, DLJ copies verbatim from "admissions" by defendants, excerpts from grand jury testimony, investigative reports, and an *in limine* motion filed by the government, and purports to incorporate them directly into its allegations.

Defendants appear to ground their attack on some form of hearsay objection.  But, the case upon which they rely, Coggins v. County of Nassau, 07-CV-3624, 2008 U.S. Dist. LEXIS 48239 (E.D.N.Y. June 20, 2008), is inapposite.  In Coggins, the plaintiff accused the defendant of perjury during grand jury testimony, but did not append to the complaint any documents evidencing that testimony.  Id. at *17.  The court concluded that it should take *judicial notice* of the related criminal proceedings, noting that courts "take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation

and related filings." Id. at *16 (quoting Crews v. County of Nassau, 06-CV-2610, 2007 U.S. Dist. LEXIS 6572, at *5 n.2 (E.D.N.Y. Jan. 30, 2007)). Here, however, the Court need not address judicial notice, because DLJ has explicitly excerpted the specific allegations from related proceedings and built them into the body of its pleading as a method of describing facts related to their contentions. Since the Court must accept as true all (and only) factual statements alleged in the complaint for purposes of a motion to dismiss, whether the statements from other proceedings, at other points in this litigation and for other purposes, might constitute inadmissible hearsay when relied upon for the truth of the matters asserted is simply irrelevant.[7]

## III.    RICO – A Challenge to the Substance of the Pleading

### A.    Applicable Law

"RICO is a broadly worded statute that 'has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce.'" Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 107 (2d Cir. 2001) (quoting S. Rep. No. 91-617, at 76 (1969)). Section 1962(c) of title 18 therefore makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." When § 1962 is violated, in addition to criminal penalties, the RICO statutes also authorize civil lawsuits, which, if successful, can entitle a plaintiff to treble damages, costs, and

---

[7]     Defendants also return to the well of Int'l Longshoremen's Ass'n, quoting its language that "[p]leading essential elements of a cause of action by purported incorporation by reference of hundreds of pages of prior pleadings in other criminal and civil cases is particularly inappropriate in a RICO case." 518 F. Supp. 2d at 464, n.76. As discussed above, in that case the plaintiff's attachment wholesale of prior pleadings obscured the allegations, and failed to provide the defendants reasonable notice of the plaintiff's claims. Here, on the other hand, DLJ's excerpting technique arguably incorporates some superfluous material, but its theories of RICO and other liability are not lost on defendants or the Court. Whether those theories withstand merits scrutiny is, of course, a different question. As to any surplus allegations, they are simply disregarded when deciding the motion to dismiss.

14

attorney's fees. 18 U.S.C. § 1964(c). Both the potential financial rewards for plaintiffs, and the stigma that may attach to RICO defendants, make the statute a powerful weapon for aggrieved parties. As a result, plaintiffs have often been overzealous in pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as RICO violations.[8] In consequence, courts must "strive to flush out frivolous RICO allegations at an early stage of the litigation." Bell v. Hubbert, 05-CV-10456, 2006 U.S. Dist. LEXIS 94547, at *12 (S.D.N.Y. Jan. 8, 2007) (quoting Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)).

To sufficiently plead a civil RICO claim, in any event, a plaintiff must show: "(1) a violation of the RICO statute [§ 1962]; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotation marks omitted).

B.    RICO Standing

Defendants assert that DLJ has failed to demonstrate "the fundamental requirement of cognizable RICO injury" because it has not exhausted other legal means to recover the $50 million in damages from the alleged fraudulent transactions. (Defs.' Br. at 10-12.) In so contending, defendants are actually arguing that DLJ lacks statutory standing under RICO.[9] See Motorola

---

[8]    In a recent opinion discussing the abuse of RICO's civil remedies, it was observed that RICO plaintiffs are notoriously unsuccessful on the whole. Gross v. Waywell, 628 F. Supp. 2d 475, 479-83 (S.D.N.Y. 2009). Conducting a "rough survey" of 145 RICO cases in the Southern District of New York between 2004 and 2007, the court found that of the 36 cases resolved on the merits by the time of the opinion, all had resulted in judgments against the plaintiffs – most on motion practice. A survey of 145 appellate decisions from around the country between 1999 and 2001 revealed that RICO plaintiffs only achieved any measure of success in 3 cases. Id. at 479-80.

[9]    "RICO standing," unlike Constitutional standing, is not a "jurisdictional" matter as such, and "a court has original jurisdiction over a RICO claim even if plaintiffs lack standing under the RICO statute." Denney v. Deutsche Bank AG, 443 F.3d 253, 266 (2d Cir. 2006) (citing Lerner v. Fleet Bank, N.A., 318 F.3d 113, 129-30 (2d Cir. 2003)). The Court's dismissal of DLJ's RICO claims for lack of statutory standing, as set forth infra, is therefore pursuant to Rule 12(b)(6), not Rule 12(b)(1). See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 55 (2d Cir. 2004) (explaining that dismissal for lack of RICO standing was "on the merits rather than for lack of subject-matter jurisdiction").

Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003) ("To satisfy RICO's standing requirements, a plaintiff must demonstrate . . . a violation of [RICO] [and] injury to business or property . . . .").

"RICO standing is a more rigorous matter than standing under Article III." Denney, 443 F.3d at 266. In essence, statutory standing under RICO incorporates an enhanced ripeness requirement: "a cause of action does not accrue under RICO until the amount of damages becomes *clear and definite*." Motorola, 322 F.3d at 135 (emphasis added) (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994)); see Denney, 443 F.3d at 266 (same); Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC, 07-CV-8139, 2008 U.S. Dist. LEXIS 67462, at *12 (S.D.N.Y. Aug. 26, 2008), aff'd, 347 Fed. Appx. 711 (2d Cir. 2009) ("Plaintiffs lack statutory standing to sue under RICO, for their damages have yet to become 'clear and definite' and are thus unripe."). On the other hand, where the extent of "damages are still unknown," a RICO injury remains "speculative" and "unprovable." Harbinger, 347 Fed. Appx. at 713; see Motorola, 322 F.3d at 135.

So, for example, "a creditor claiming that its ability to collect its debt has been impaired or frustrated by a RICO violation lacks standing to sue under RICO for the amount of the debt as long as the extent of the loss remains uncertain, as for example where collection efforts continue." First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 219 F. Supp. 2d 576, 578 (S.D.N.Y. 2002), aff'd, First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004). Critically, then, an allegedly defrauded creditor's losses will be uncertain, and "RICO injury is speculative[,] when *contractual or other legal remedies* remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced." In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 59 (2d Cir. 1998) (emphasis added); see First Nationwide, 27 F.3d at 768 ("[A] [RICO] plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been

16

frustrated."); Elsevier, Inc. v. W.H.P.R., Inc., 692 F. Supp. 2d 297, 312 (S.D.N.Y. 2010); Am. Med. Ass'n. v. United Healthcare Corp., 588 F. Supp. 2d 432, 440 (S.D.N.Y. 2008); see, e.g., Harbinger, 347 Fed. Appx. at 713 (finding no RICO standing where plaintiff, a fraudulently induced lender, could potentially recover some damages in pending proceedings arising out of defendant's involuntary bankruptcy); Motorola, 322 F.3d at 136 (finding plaintiff lender's RICO claims unripe where pending arbitration "and other conceivable contingencies" could abate plaintiff's losses).[10] In RICO cases alleging fraudulently induced mortgages, mortgagees or their assignees are required to pursue foreclosure remedies before they have RICO standing. See, e.g., Id. at 135-36 (noting that it was "undisputed that Plaintiffs have not foreclosed on the loans at issue here"); First Nationwide, 27 F.3d at 769 ("[T]he loss [plaintiff] would suffer as to those loans [it] has not finally foreclosed cannot yet be determined."); Am. Home Mortg. v. UM Sec. Corp., 05-CV-2279, 2007 U.S. Dist. LEXIS 26670, at *12-*13 (plaintiff lacked standing under RICO "based on loans that have not yet been finally foreclosed"). In short, if an alternate route to recovery is available, a putative RICO plaintiff must pursue it first.

Goldfine v. Sichenzia, 118 F. Supp. 2d 392 (S.D.N.Y. 2000), is directly on point. The plaintiffs in that case were lenders on a series of loans secured by allegedly fraudulent mortgages, notes, and insurance policies. The defendants included, among others, defaulting family members and corporate entities that they controlled, abstract companies that "failed to record in a timely manner various instruments, including mortgages, deeds, and agreements," and an attorney who provided "wrongful" opinion letters. Id. at 395-96. Due to lack of recordation, the defendants "lost priority on certain mortgages, and certain of the properties were purchased by third parties without notice of encumbrance." Id. at 395. As a result, the defendants were able to default and "obtain

---

[10] Confirming the quoted language from In re Merrill Lynch, the Second Circuit has explicitly rejected the argument that the exhaustion requirement "is limited to cases where a plaintiff has failed to exhaust his contractual remedies." Harbinger, 347 Fed. Appx. at 713. On the contrary, the "reasoning broadly extends to non-contractual remedies as well." Id.

additional monies from third parties who took title to the property or gave mortgages without constructive knowledge of Plaintiffs' (supposedly) prior liens." Id. at 396. Plaintiffs therefore sought damages "totaling the full amount of the proceeds of each and every loan." Id. at 397. The effort failed. Since there were mortgages and notes underlying the loans, and plaintiffs had not "made any effort whatsoever to recover their alleged losses, or even any part of such losses, by seeking to enforce any of their admitted contractual rights," the court held that there was no RICO standing. Id. at 398. In so ruling, the court rejected plaintiffs' claim that pursuing contractual remedies would be futile, and dismissed their arguments that the underlying mortgages and notes were "unenforceable" as "legal conclusions that must be reached by a court of competent jurisdiction before [plaintiffs] will suffer any RICO injury." Id. Moreover, the plaintiffs' pendent state law claims (including claims for breach of contract, constructive trust, and fraud), over which the court refused to exercise supplemental jurisdiction, were additional unexhausted remedies. The court went on to observe, essentially, that the pendent claims were a poison pill to standing:

> Plaintiffs' 118 separate state law claims . . . are the very claims that Plaintiffs must pursue in order to determine whether or not they suffered any injury compensable under RICO. Plaintiffs cannot come to this court, with only a RICO claim as a jurisdictional predicate, and obtain adjudication of the State law claims that are a necessary predicate to ripeness and standing under the very statute they claim gives this Court jurisdiction in the first instance. Were this Court to adopt Plaintiffs' pleading rationale, RICO's "clear and definite" injury requirement would be rendered moot.

Id.

Applying these principles to the facts at bar, it is clear that DLJ does not have statutory standing to pursue its RICO claims, as it has contractual and other legal remedies (particularly with respect to subject properties which have not been resold) that it could pursue – and is currently pursuing in some cases – to recover the $50 million in damages it seeks in this action. DLJ attempts to hurdle the "other available remedy" roadblock by citing to New York law and arguing that "foreclosure proceedings are impossible given the fact that DLJ's unrecorded mortgages were

18

fraudulent . . . and that DLJ has no enforceable contractual rights." (Pl.'s Opp. (Dkt. #195) at 46.)

Yet, vague and imprecise actual damages remain the watchword. To be sure, DLJ's argument

parallels the argument rejected by the court in Goldfine, which required as a prerequisite to standing

a judicially determined state law claim. DLJ's assumption that pursuit of relief in more traditional

legal proceedings would be futile does not permit it to skip over those proceedings and head straight

for treble damages in a RICO action.[11] See Harbinger, 347 Fed. Appx. at 713 (explaining that

RICO claims were not ripe "even though . . . recovery in the pending action might be a 'forlorn

hope'") (quoting Motorola, 322 F.3d at 137). Bluntly, among other open issues, the enforceability

of the mortgages must be conclusively resolved *prior to* affording DLJ RICO standing.

In any case, potential foreclosure proceedings notwithstanding, the amended complaint itself

demonstrates that DLJ is already pursuing other contractual and legal remedies to recover damages

arising out of the 95 fraudulent transactions. For example, DLJ has brought contract-based actions

against Coastal Capital for breach of representations in the Loan Purchase Agreement, and against

four straw buyers for the value of promissory notes.[12] DLJ also states claims for fraud, civil

conspiracy, conversion, and unjust enrichment against all defendants, jointly and severally, for

damages exceeding $50 million.[13] These claims must also be resolved prior to interposition of the

---

[11] DLJ's attempt to distinguish Goldfine on the ground that it merely involved "undersecured" lenders fails. Imprecision in the damages is the critical point that the cases have in common. Moreover, DLJ has struggled throughout this action to get pre-judgment relief because, as with "undersecured lenders," DLJ believes that there *are* valuable assets to be had that ameliorate the shortfall – assets, presumably, equally reachable if those other avenues of relief are pursued.

[12] DLJ believes that Coastal Capital ceased its operations in 2007 and is "defunct." Even if true, DLJ has not sufficiently pled that it has been frustrated in its pursuit of contractual or other remedies relating to its overall claims, regardless of the status of any individual defendant.

[13] In April 2010, DLJ filed a complaint in Supreme Court, New York County, alleging fraud claims against title insurance companies – including those allegedly "responsible for the appearance of authority in Clear View Abstract, T. Doumazios, Esq., Triumph Abstract and S. Brown, Esq. to act as the title agent in connection with closings of many of the 95 Fraudulent Transactions" – seeking millions of dollars in damages arising out of the Kontogiannis "conspiracy." (See Complaint in DLJ Mortgage Capital, Inc. v. Halifax Group, LLC et al., Index No. 104675/10 (New York County Ct., Apr. 9. 2010) at ¶ 198.)

RICO claims to ensure that there is a clear and definite injury, and, absent a federal jurisdiction peg independent of the RICO claims, must be resolved in a state forum. Cf. Ritter v. Klisivitch, 06-CV-5511, 2008 U.S. Dist. LEXIS 58818, at *20-*21 (E.D.N.Y. July 30, 2008) (finding judgment creditor plaintiff's damages "indefinite and unprovable" where "plaintiff's collection efforts were ongoing . . . by virtue of the federal action itself in which plaintiff asserted . . . fraudulent conveyances under state law").

In sum, it cannot be determined at this point whether DLJ's other remedies will mitigate or even fully satisfy its damages, so its substantive RICO claims premised on failure to recover those damages are not yet ripe. For the same reason, DLJ's RICO conspiracy claims brought pursuant to § 1962(d) also fail. See Knoll v. Schectman, 275 Fed. Appx. 50, 51 (2d Cir. 2008) ("[A]ny claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.") (quoting Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128, 119 S. Ct. 493 (1998)); Elsevier, 692 F. Supp. 2d at 312 (explaining that "the Court's dismissal of the § 1962(c) claim mandates dismissal of the [RICO] conspiracy claim"). Both RICO claims must be dismissed for want of standing.[14]

### Conclusion

In line with the foregoing, plaintiff's § 1962(c) and § 1962(d) RICO claims are dismissed without prejudice. Given the early stage dismissal of all federal claims, and especially the reasons for it, the Court declines to exercise its supplemental jurisdiction over the pendent state claims alleged in the amended complaint. See 28 U.S.C. § 1367(c)(3); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 619 (1988) ("In the usual case in which all federal-law

---

[14]  In light of this holding, the Court need not address defendants' various arguments that DLJ failed to satisfy other pleading requirements in stating its RICO claims.

20

claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Furthermore, the Court observes that its decision to decline the exercise of supplemental jurisdiction is not only unopposed, but urged by defendants and plaintiff alike. (Defs.' Br. at 25; Pl.'s Br. at 53.) Finally, leave is granted to replead all pendent claims pled in the amended complaint in any appropriate state forum.

Enforcement of that part of this Order dismissing the amended complaint is, however, stayed through and including August 6, 2010, and any preliminary relief previously ordered in this action shall remain in effect until that date but without prejudice to plaintiff's right to seek the same or similar relief in state court.


SO ORDERED.

Dated: Brooklyn, New York
      July 23, 2010

                              ERIC N. VITALIANO
                              United States District Judge